[Sac. No. 7894. In Bank. Oct. 8, 1971.]

ELLSWORTH MacFADDEN, Plaintiff, Cross-defendant and Appellant, v. CLAUDIA WALKER, Defendant, Cross-complainant and Respondent.

810

## Counsel

Tindall & Tindall and Kern E. Tindall for Plaintiff, Cross-defendant and Appellant.

Chamberlain & Chamberlain and Paul H. Chamberlain for Defendant, Cross-complainant and Respondent.

John R. Hetland as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

## OPINION

**WRIGHT, C. J.**—In this case we are called upon to determine whether a vendee who would otherwise be entitled to specific performance of an installment land sale contract in which time is declared to be of the essence forfeits the right to that remedy because of her wilful failure to make installment payments when due after there has been substantial part performance of the contract. We conclude that the policy against forfeitures precludes denying the right to specific performance under such circumstances.

Sometime before 1950 defendant and cross-complainant Claudia Walker, who lived in Oakland, became interested in buying 80 acres of unimproved property. The property was located in Placer County near Auburn and was owned by plaintiff and cross-defendant Ellsworth MacFadden, who lived in Auburn. Early in 1950 the parties orally agreed that Mrs. Walker would buy the property for $2,500. She paid MacFadden $10, and he agreed to fix the road to the campsite on the property and move in some small buildings for $150. This work was done, and Mrs. Walker took possession, moved a caretaker onto the property, and undertook the payment of taxes. It does not appear that she paid the $150, but sometime before April 1953 a third party removed timber from the property for which MacFadden received $600.

In April 1953 the parties entered into a written contract for the sale of the property for $2,484.50. Pursuant to its terms Mrs. Walker paid $20 on the purchase price and $25 to MacFadden's attorney for preparing the contract. She agreed to pay $20 per month, which included 6 percent interest on the unpaid balance, and all taxes. The contract also provided that no timber could be removed without the consent of MacFadden; that Mrs. Walker had the right to pay all or any part of the unpaid principal at any time; that time was of the essence; and that on any default of Mrs. Walker, MacFadden could terminate all of her rights under the contract and retain all payments theretofore made as the reasonable value for the use of the property.

After the written contract was entered into, Mrs. Walker paid all of the installments due through November 1, 1963, a total of $2,500. She also paid the taxes, bought lumber and made improvements, kept a caretaker on the property, and paid for the installation of electricity. In late 1963, however, she discovered that timber had been cut and taken from the property, and she therefore stopped making payments. There was no evidence as to who cut and took the timber.

In May 1964 MacFadden mailed a notice to Mrs. Walker that he was terminating her rights under the contract because of her default, but she testified that she did not receive this notice. In May 1966 MacFadden filed this action against Mrs. Walker to quiet title to the property. After she was served with summons Mrs. Walker offered to pay the entire principal balance of $1,174.70 with compound interest, but MacFadden rejected her offer. Thereafter she filed an answer and cross-complaint seeking specific performance and deposited the principal balance plus compound interest with the court. In her answer and cross-complaint she alleged that she was not in default on the ground that she was entitled to a $600 credit for the proceeds for the removal of timber she alleged MacFadden received. At the pretrial conference, however, she abandoned the claim to any credit and further acknowledged an obligation to pay MacFadden an additional sum of $71.12 for taxes he paid for the year 1964 and $50 interest on the amount deposited in court. She paid the $50 into court and the $71.12 to MacFadden's attorney.

At the conclusion of the trial the court found that the property was reasonably worth the agreed price and that therefore the contract was "fair, just, and reasonable as between the parties and the consideration inuring to . . . [MacFadden] was adequate." (See Civ. Code, § 3391, subds. 1 and 2.) It also found that in December 1963 a dispute arose between the parties with respect to a credit of $600 because of the removal of timber, and that, although Mrs. Walker was mistaken with respect to her right to a credit, she acted in good faith and her cessation of monthly payments "did not constitute a grossly negligent, willful, or fraudulent act, or breach of duty." (See Civ. Code, § 3275.) Accordingly, it entered judgment awarding Mrs. Walker specific performance against MacFadden. Since the contract provided for the payment of attorney's fees and since Mrs. Walker's mistake with respect to her right to a credit precipitated the litigation, however, the court awarded MacFadden judgment for attorney's fees of $200 and costs incurred in bringing the action. MacFadden appeals.

He contends that the evidence does not support the finding that the consideration was adequate and the finding that Mrs. Walker was not guilty of a wilful breach of duty in stopping payments. Although there was a sharp

conflict in the valuation evidence, there was an abundance of substantial evidence that the property was reasonably worth the contract price. Accordingly, the trial court's finding in this respect cannot be disturbed. ██ We agree with MacFadden's contention, however, that the evidence does not support the finding that Mrs. Walker's breach was not wilful. She testified that she stopped payment "Because there was a lot of timber cut off the place," but she did not state that MacFadden was in any way responsible therefor or any facts that would suggest a good faith belief that he was. It appears from its memorandum opinion that the trial court considered Mrs. Walker's advanced age (she was 84 at the time of trial) in evaluating her testimony and in concluding that she had difficulty with her memory. Nevertheless, to qualify for relief from default under section 3275 of the Civil Code,[1] the burden was upon her to establish that her breach was not wilful (*Barkis* v. *Scott* (1949) 34 Cal.2d 116, 120 [208 P.2d 367], and cases cited), and a failure of memory on her part, if any, is not substantial evidence that fills the lacuna in her proof. ██ Accordingly, the question presented is whether failure to qualify for relief from forfeiture under section 3275 precludes the right to specific performance.

In *Barkis* v. *Scott, supra,* 34 Cal.2d 116, we reevaluated the long line of precedents dealing with the question of when the vendee's interest may be forfeited because of his default in the performance of a land sale contract in which time is declared to be of the essence. We concluded that when a forfeiture would otherwise result, the vendee can be relieved therefrom if he proves facts justifying relief under section 3275 of the Civil Code, and we held that the defaulting vendees in that case had established their right to keep their installment contract in force. Since it appeared as a matter of law that the vendees' breach in *Barkis* was neither grossly negligent, wilful, nor fraudulent, but was at most the result of simple negligence in the management of their checking account, we had no occasion to consider whether section 3275 was the exclusive source of their right to be relieved from forfeiture by keeping their contract in force.

Thereafter in *Freedman* v. *The Rector* (1951) 37 Cal.2d 16 [230 P.2d 629, 31 A.L.R.2d 1], we held that section 3275 is not the exclusive source of the right to relief from forfeiture. We concluded that the prohibition of punitive damages for breach of contract (Civ. Code, § 3294), the strict limitations on the right to provide for liquidated damages (Civ. Code, §§ 1670, 1671), and the provision that "Neither specific nor preventive

---

[1] Section 3275 provides: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

relief can be granted to enforce a penalty or forfeiture in any case . . ." (Civ. Code, § 3369) together established a policy that precludes any forfeiture having no reasonable relation to the damage caused by the vendee's breach even when that breach is wilful. (See also *Baffa v. Johnson* (1950) 35 Cal.2d 36, 37-39 [216 P.2d 13].) Since in the *Freedman* case, however, the vendor had sold the property to a third party in reliance on the vendee's repudiation of the contract, specific performance was not an available remedy, and relief from forfeiture was necessarily limited to awarding the defaulting vendee restitution in the amount of the excess of his part payment over the damages caused by his breach.

We believe that the anti-forfeiture policy recognized in the *Freedman* case also justifies awarding even wilfully defaulting vendees specific performance in proper cases. (Accord: *Ward v. Union Bond & Trust Company* (9th Cir. 1957) 243 F.2d 476, 480-481; see Hetland, Cal. Real Estate Secured Transactions (1970) § 3.60, pp. 105-106.) As we pointed out in the *Barkis* case, allowing the defaulting vendee to cure his default and perform the contract may often be the fairest solution, for the unjust enrichment of the vendor that is precluded by restitution of the excess of part payments over the damages caused by the breach may bear little or no relation to the forfeiture imposed on the vendee if his right to perform the contract is terminated. "A vendee in default who is seeking to keep the contract alive, however, is in a better position to secure relief than one who is seeking to recover back the excess of what he has paid over the amount necessary to give the vendor the benefit of his bargain after performance under the contract has terminated. In the latter situation it may be so difficult to compute the vendor's damages that the vendee will be unable to prove that the vendor will be unjustly enriched by allowing him to keep all the money that has been paid. [Citations.] On the other hand, when the default has not been serious and the vendee is willing and able to continue with his performance of the contract, the vendor suffers no damage by allowing the vendee to do so. In this situation, if there has been substantial part performance or if the vendee has made substantial improvements in reliance on his contract, permitting the vendor to terminate the vendee's rights under the contract and keep the installments that have been paid can result only in the harshest sort of forfeitures." (34 Cal.2d at pp. 121-122.)

MacFadden contends, however, that the decision in *Honey v. Henry's Franchise Leasing Corp.* (1966) 64 Cal.2d 801 [52 Cal.Rptr. 18, 415 P.2d 833], establishes that restitution of the excess of the part payments over the damages caused by the breach is the exclusive remedy available to a wilfully defaulting vendee. He invokes the following language: "When a vendee has materially breached his contract, the vendor has an election to

rescind or to enforce the contract. [Citations.] The defaulting vendee, however, has no such election. Otherwise, the contract of sale would in effect be a lease with an option to purchase. The vendee would receive the benefit of any increase in the value of the property, and the vendor would bear the entire risk of any decrease in its value. Such protection to a defaulting vendee would go beyond that provided by anti-deficiency legislation, which places the risk of depreciation in value on the vendor only to the extent that the value of the property may decrease below the amount still owing on the contract." (64 Cal.2d at p. 804.)

In the *Honey* case, however, neither party sought specific performance, and our discussion of election of remedies was directed solely to the alternative measures of restitution that might be invoked following the vendee's breach. It was in that context that we stated that it was only the vendor who, on the vendee's breach, had the election to rescind the contract by retaining rental value damages or to enforce the contract by retaining benefit of the bargain damages. Accordingly, there is nothing in the *Honey* case that precludes granting specific performance to a wilful but repentant defaulting vendee.

It bears emphasis, of course, that we are here dealing with an equitable remedy that is carefully hedged around with protections to the person against whom it is invoked. The contract must be just and reasonable, and the consideration adequate (Civ. Code, § 3391), the vendor must be assured that he too will receive the benefit of his bargain (Civ. Code, § 3386), and the defenses of laches and unclean hands are available to preclude a defaulting vendee from seeking an unfair advantage over an innocent vendor. In the present case, however, we find no basis for upsetting the trial court's judgment awarding specific performance. The contract was just and reasonable and the consideration was adequate. MacFadden is assured and will receive the full benefit of his bargain. Mrs. Walker had paid over half the price before she defaulted, and the value of the land adequately secured her obligation to pay the remainder. Although she failed to prove that her default was not wilful, it appears at worst to have been the petulant reaction of an elderly lady to an apparent theft of timber from her property. It is true that the default lasted for over two years, but such delay may be considered as much the responsibility of MacFadden as Mrs. Walker. A vendor can always bring an appropriate action immediately after the default if he deems it desirable to get, promptly, either his property back or the balance of the contract price. For aught that appears, however, it may have been in MacFadden's best interest to await further developments in the market for such property even though no installment payments were being made during the interim. Indeed, that apparently was the arrangement which was

satisfactory to both parties during the three years between the 1950 oral contract and the 1953 written contract.

Finally, we note again, as we also did in the *Honey* case, Professor Hetland's persuasive arguments that installment land sale contracts should be treated as security devices substantially on a par with mortgages and deeds of trust, and that therefore "the law governing those security devices should be adopted with appropriate modifications in determining the remedies for breaches of installment contracts." (*Honey* v. *Henry's Franchise Leasing Corp., supra,* 64 Cal.2d 801, 804; see Hetland, Cal. Real Estate Secured Transactions, *supra,* §§ 3.58-3.81, pp. 100-134.) That law affords even the wilfully defaulting debtor an opportunity to cure his default before losing his interest in the security. (See Hetland, *supra,* § 3.60, pp. 105-106; see also *Petersen* v. *Ridenour* (1955) 135 Cal.App.2d 720, 728 [287 P.2d 848].) Since we have concluded, however, that Mrs. Walker is entitled to the remedy of specific performance, we need not decide whether she might also be entitled to some other remedy under the law governing security transactions.

The judgment is affirmed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied November 18, 1971.